IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAUREEN L. STERNER, | : | CIVIL ACTION NO. **3:CV-04-2636** |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | (Magistrate Judge Blewit) |
| | : | |
| TOWNSHIP OF TUNKHANNOCK, et al., | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

**I. Background.**

On December 6, 2004, Plaintiff, Maureen L. Sterner,  through counsel, filed this civil rights

action pursuant to 42 U.S.C. § 1983.  (Doc. 1).  Jurisdiction of this Court is found at 28 U.S.C.

§§ 1331 & 1343(a).  The Plaintiff advanced two federal counts, Count One under the First

Amendment and the Fourteenth Amendment of the Constitution against the two individual

Defendants, and Count Two a *Monell* municipal liability claim against the Defendant Township.

Count Three asserts a state law claim against the Defendant Township for violation of the

Pennsylvania Sunshine Act.[1]  Plaintiff paid the requisite filing fee.  Named as Defendants are the

following: Tunkhannock Township; Francis A. Altemose, II; and Jim Sterrett.  Both individual

---

[1]If the Court finds that Plaintiff's federal claim (Count Two) against the Defendant
Township should be allowed to proceed, this Court will exercise jurisdiction over Plaintiff's
pendent state claim under the Pennsylvania Sunshine Act  contained in Count Three of her
Complaint.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130 (1966).  Thus, if
Plaintiff's § 1983 claim against the Defendant Township, over which we have original
jurisdiction, is going to proceed, the Court should exercise supplemental jurisdiction over
Plaintiff's Pennsylvania Sunshine Act claim against this Defendant.  *See* 28 U.S.C. § 1367(c)(3).

Defendants are members of the Defendant Township's Board of Supervisors. (*Id.,* p. 1).[2]  Following service of the Summons and Complaint, all of the Defendants jointly filed an Answer to the Complaint with Affirmative Defenses on January 10, 2005.  (Doc. 6).  Following discovery, Defendants jointly moved for summary judgment on November 30, 2005.  **(Doc. 18).**  Defendants' Summary Judgment Motion has been briefed by the parties, including statements of material facts ("SMF"), and exhibits have been submitted by both parties.  (Docs. 19-23, 27, 28, 30, 31, 32).  Defendants' joint Motion for Summary Judgment is ripe for disposition.[3]

## II. Motion for Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.  The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56( c).  An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A fact is "material" if proof of its existence or non-existence could affect the outcome of the action pursuant to the governing law.  *Anderson*,  477 U.S. at 248.  "Facts that could alter the outcome are material facts."  *Charlton v. Paramus Bd. of*

---

[2] Since both of the individual Defendants are Township officials, they are state actors for purposes of § 1983.

[3] Since the parties have consented to the jurisdiction of a Magistrate Judge, the District Court reassigned this case to the undersigned. Doc. 9.  *See* 28 U.S.C. § 636(c)(1).

2

*Educ.*, 25 F. 3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983). Upon such a showing, the burden shifts to the nonmoving party. *Id*. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id*., *quoting Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co*., 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

Under Rule 56 summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**III.  Section 1983 Standard.**

In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States. *Parratt v. Taylor*, 451 U.S. 527 (1981); *Kost v.*

*Kozakiewicz*, 1 F. 3d 176, 184 (3d Cir. 1993).[4] See also *Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 498-499 (M. D. Pa.).

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. *See, e.g., Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 1546 F.2d 1077, 1082 (3d Cir. 1976); *Parratt, supra*. It is also well settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement. *Id.* Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which Plaintiff's claims are based. *Id.* As the Court stated in *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998):

> A defendant in a civil rights action must have personal involvement
> in the alleged wrongs . . . . [P]ersonal involvement can be shown
> through allegations of personal direction or of actual knowledge and
> acquiescence. Allegations of participation or actual knowledge
> and acquiescence, however, must be made with appropriate
> particularity. (Citations omitted).

---

[4]Section 1983 is not a source of substantive rights. Rather, it is a means to redress violations of federal law by state actors. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

4

A civil rights complaint must state time, place, and responsible persons. *Id.* Courts have also held that an allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to section 1983 liability. *See Rode,* 845 F.2d at 1208. With these principles in mind, the Defendants' Motion for Summary Judgment will be discussed.

## IV. Allegations of Complaint.

In Count One, Plaintiff asserts First Amendment claims, alleging that she was not reappointed as Township secretary/treasurer in January 2004 as a result of retaliation for her exercise of her free speech right and free association right with respect to her support in 2001 for Tom Delese, who opposed Defendant Altemose for the position of Township Supervisor, and with respect to her participation in a subsequent legal challenge to the election of Altemose in November 2001. In Count Two, Plaintiff alleges that the decision to terminate her in retaliation for the exercise of her First Amendment  rights was officially adopted and promulgated by Defendant Township's officers acting as Township supervisors. (Doc. 1, ¶ 32.). Count Two is a municipal liability claim under § 1983 against the Defendant Township. *See Monell v. Dept. of Soc. Servs., NYC,* 436 U.S. 658 (1978). As stated, in Count Three, Plaintiff alleges that the Defendant Township violated the state Sunshine Act and violated Township ordinances. As relief, Plaintiff seeks both compensatory and punitive damages.[5]

---

[5]Plaintiff seeks punitive damages as against the two individual Defendants in Count One and against the Defendant Township in Count Three. (Doc. 1, ¶ 's 30. & 42.). Plaintiff correctly does not seek punitive damages as against the Township Defendant in Count Two, her federal claim against this Defendant. *See Carlton v. City of Phila.,* 2004 WL 633279 *2 (E.D. Pa.).

However, to the extent that Plaintiff is deemed as suing Defendants Altemose and Sterrett in their official capacities as Township Supervisors, *i.e.* alleging that these Defendants were acting within the scope of their employment as Township Supervisors (Doc. 1, ¶'s 3.-4.), we find that Plaintiff's damages claim against them in their official capacities should be dismissed. *See Carlton, supra* * 8 ("actions against government employees in their official capacities 'generally represent only another way of pleading an action against an entity of which an officer is an agent'") (citation omitted); *Douris v. Schweiker*, 229 F.Supp2d 391, 400 (E.D. Pa. 2002); *Dill v. Com. of PA,* 3F.Supp.2d 583, 587 (E.D. Pa. 1998). Plaintiff's claims against the individual Defendant Supervisors under § 1983 in their official capacities are, in effect, suits against the Defendant Township.[6] Since the Township has been named as a Defendant herein, we see no need for official capacity claims against Supervisor Altemose and Supervisor Sterrett. *See Kenny v. Whitpain Twp.*, 1996 WL 445352 *2 (E.D. Pa.).

As stated, the Plaintiff asserts one federal count against the individual Defendants. As her first count, under § 1983, the Plaintiff raises violations of the First Amendment of the United States Constitution, essentially claiming that her termination from her Township job by Defendants was solely motivated by her exercise of her First Amendment free speech and free association rights to support a candidate who ran against Defendant Altemose for political office, namely Township Supervisor, and due to her participation in the election challenge to Defendant Altemose. Plaintiff avers that "[o]n January 5, 2004, Defendants intentionally, purposefully terminated Plaintiff's

---

[6]In fact, in her request for damages against the individual Defendant Township Supervisors in her § 1983 claim (Count One), Plaintiff seeks damages against them individually. (Doc. 1, Wherefore Clause following ¶ 30.).

employment [as Township secretary/treasurer] solely in retaliation against her for exercising her First Amendment rights to Free Speech and Association, ... . " (Doc. 1, ¶ 23.).[7]  As relief, the Plaintiff seeks  monetary and punitive damages against the individual Defendants, including damages for lost past wages and  earnings, loss of future  income, loss of benefits, loss of earning capacity, and loss of reputation.  (Doc. 1, ¶'s 27.-29.).

## III.  Material Facts.

The undisputed material facts, as viewed in a light most favorable to the Plaintiff,[8] are as follows:

Plaintiff began her employment with Defendant Township in 1995 as a clerk.  Subsequently, Plaintiff became  Township  Secretary/Treasurer.   Plaintiff  remained  employed  by  Defendant Township through January 2004.  The duties of Township Secretary/Treasurer are contained in the Township Personnel Policy.  (Doc. 23, Ex. 3, Att. 8).  The Personnel Policy applied to all appointees and employees of the Township.  The Pennsylvania Township Code is found at 53 P.S. § 65101,

---

[7]As discussed below, we find that supporting a political candidate constitutes speech and association that are protected by the First Amendment.  *See Phila. Fire Fighters' Union Local 22 v. City of Phila.*, 286 F. Supp. 2d 476 (E.D. Pa. 2003)(contribution to a political cause constitutes speech and association protected by First Amendment).  The issues in this case thus become whether the Plaintiff's conduct in supporting a candidate from the same party who ran against Defendant Altemose for supervisor was a substantial and motivating factor in Plaintiff's termination from her job with the Township, and whether the Defendants would have dismissed Plaintiff even in the absence of such conduct.

[8]*See* Docs. 20 & 30.  While Plaintiff also filed her own counter SMF in addition to her responses to Defendants' SMF (Doc. 27), this Court's Local Rule 56.1 does not provide for such a filing.

*et seq.*

In 2001, the Township Supervisors were Patricia Moore, William Bourke and Tom Delese. At all relevant times, all elected officials in Defendant Township were Republicans. In May 2001, during the Republican primary election, Defendant Altemose ran against Tom Delese to be the Republican candidate for Township Supervisor in the November 2001 general election. Defendant Altemose defeated Delese in the 2001 Republican primary in Defendant Township. Delese began a write-in candidacy for the general election for the Township Supervisor position against Defendant Altemose and the Democratic candidate. Defendant Altemose became aware that Delese was running a write-in campaign for Supervisor in the November 2001 general election. Altemose did not identify Plaintiff as a major supporter of the write-in campaign who was in Delese's inner circle. (Doc. 23, Ex. 3, p. 17).

After the general election for Township Supervisor, in which Altemose was elected, he became aware that a lawsuit challenging the validity of the election was filed in state court in Monroe County, Pennsylvania. Altemose stated that he recognized Plaintiff's name as an individual who signed a verification to the Delese election challenge petition to the November 2001 Township Supervisor general election. He characterized various individuals who signed the verification as supporters, opponents or neutral, and he stated that Plaintiff was an opponent. Altemose indicated that Plaintiff was a political opponent of his, and stated that "she did not campaign for Tommy [Delese], but they were very close friends." He stated that based on this close friendship, "I would assume that she [Plaintiff] would be helping Tommy, by voting for him." (*Id.*, p. 49).

8

The election challenge petition to the 2001 Township Supervisor election was later withdrawn. In January 2002, Altemose was sworn in as a Township Supervisor. The other two Supervisors were Moore and Bourke. They were all Republicans. Moore avers that Altemose was the minority Supervisor. Altemose was at the Township reorganizational meeting in January 2002. At this meeting, Altemsoe abstained from voting for Township appointees including Plaintiff. Altemose testified that he abstained because he "was not happy with the current direction that the Township was going into. And Everyone works as a whole in the township. ... Everyone working hand in hand with everyone else towards a common goal." (Doc. 23, Ex. 3, p. 67). Plaintiff was not singled out on Altemose's vote to abstain; his vote was for the entire list of appointees. (*Id*,. p. 69). Altemose testified that his vote had nothing to do with Plaintiff's performance; rather, it had to do with the policy that road maintenance in the Township was not a high priority. Specifically, Altemose testified as follows:

> It has nothing to do with performance. It could have to do with priorities. Priorities are set by the board of supervisors and the secretary, slash, treasurer.

> Q.      Does the secretary  - -

> A.      The secretary, slash, treasurer is one of the highest positions in the Township. She assisted the supervisors in making policy. And that policy was not to have road maintenance as a high priority.

> Q.      Did you ever  - - did Maureen Sterner ever cast a vote as a member of the board of supervisors?

> A.      She had [accidentally once] tried.

(*Id*., p. 70).

He further stated:

> But the answer to your question, once again, to make a township function effectively, every employee, every appointee, has to have a common, single set of goals to go into specific directions.
>
> The biggest, largest change in direction that occurred in this township was road maintenance.  And from what I had observed, over say years, months, what I saw at meetings, road maintenance was not a nigh priority on her list.
>
> Q.     Who determines township policy?
>
> A.     Township policy is determined by the board of supervisors, and from what I could see, Maureen participated in that.

(*Id.*, p. 71).

Altemose stated that he abstained on the vote to reappoint Plaintiff because she did not want to promote road maintenance as a priority of the Township.  He stated:

> You voted not to give her the job  - -
>
> A.     Not to reappoint her.
>
> Q.      - - by abstaining.  By abstaining, because road priority was not a  - - road maintenance was not a high priority to her.  And you suggested that she determined that township policy prior to your vote.
>
> I want to know specifically what you observed that led you to the conclusion that Maureen Sterner was against prioritizing road maintenance for the Township in her role as treasurer  - - secretary-treasurer.
>
> A.     General observations of the person.  We are all relatively consistent in what we think is important in our lives.  You follow what person wants to do, wants to promote.  And I never saw road maintenance in something that she wanted to promote.
>
> I saw her want to promote various activities, various activities with vigor, but I never saw any vigor in road maintenance.

10

>       Or, to go a step further, purchasing and obtaining the equipment
>       to conduct maintenance with.  That is an equal statement to the
>       road maintenance priorities.
>
>       If you were to compare the equipment that we own today
>       compared to the equipment that was owned at that point in time,
>       you would see a tremendous difference in what the Township owns.
>       That should point to you the truth in my statements that the
>       Township today, its highest priority is road maintenance.
>
>       To continue further, the money was available at that time
>       in the past, but it was never proposed to spend it for equipment
>       to do serious road maintenance.

(*Id.*, pp. 72-73).

Thus, Altemose voted to abstain on Plaintiff's reappointment since he felt that her lack of promoting road maintenance as a priority stopped the Township from buying equipment necessary for road maintenance.  He felt that Plaintiff did not promote the need for aggressive road maintenance, even though she, undisputedly, had no vote as Township Secretary/Treasurer.  (*Id.*, p. 74).

Prior to January 2002, Tom Delese was a Township Supervisor as well as the Road Master. Altemose disagreed with Delese's position on purchasing equipment and with his votes on such purchases.  Plaintiff did not have the right to vote on any equipment purchases.  She could lobby the Township Supervisors as to what she believed the Township needed, as could any other citizen of the Township.  Altemose stated that Plaintiff never exercised her right to lobby for road maintenance.  Altemose testified that Plaintiff was not a Township employee; rather she was an appointee of the Township, and as such, she had to be reappointed to her position every January by the Supervisors, unlike employees.  (*Id.*, p. 76).

11

During 2002, Altemose stated that he evaluated Plaintiff's performance and found as follows:

> In that first year, anything that strikes you about her performance was particularly good.
>
> A.     Treasurer, good.  Secretary, that was good.  As far as being a team leader in the office and distributing and empowering the other employees, fair.  As far as a team player in the relationship with the Department of Public Works officials, very bad.  It was a very bad relationship.
>
> Q.     Empowering other employees in the office, what does that mean?
>
> A.     Well, I'll tell you exactly what that means.  That means a leadership style.  There's many different types of leadership styles.
>
> What used to exist here is you had a center figure, which was Maureen.  She was the one that made the high-end decisions on the entire office staff.  She directed the assistant, with not that much doing on her own or what to do, the zoning officer, the sewage enforcement officer, the assistant zoning, assistant sewage enforcement officer.  Those people around her, she essentially made the high-end decisions for them.
>
> That type of management I do not like.  What you have to have in a management structure is you have to be able to have all of the people around you making high-end decisions but still review them to make sure nothing is done incorrectly.
>
> Q.     All right.
>
> A.     That is my statement there.
>
> Q.     Are you telling me that you personally believe that she supervised the zoning officer?
>
> A.     On high-end things, yes.

(*Id.*, pp. 84-84).

12

Altemose stated that while Plaintiff was not the supervisor of the zoning officer, in reality they all reported to Plaintiff. (*Id*.).      However, Altemose stated that during the years of 2002-2003, he could not think of any high-end decisions that Plaintiff made as secretary/treasurer. (*Id*., p. 91).

Altemose testified about what he believed to be a problem with functionality in the way the Township office was run and stated:

> Now let's  - - so if you're saying as it relates to office management you cannot think of a single high-end decision she made in 2002  - -
>
> A.      My memory  - - my memory has come up with one right now.
>
> Q.      In 2002.
>
> A.      It may have been late 2002, maybe 2003.  I can't clarify the date, but I can give you a very, very large  - - it was a running of almost a program.  And it was between the office and between the Department of Public Works.  It was over road inspections in Mountain Terrace Estates.  This is when I became aware that our functionability really wasn't where it needed to be.
>
> Tommy Delese was not in the acting roadmaster position.  He had health problems.  And Joey Benner was the unappointed alternate roadmaster.  And Joey would come to Maureen for the task schedules.
>
> And the task schedules, we were going through the road observations, inspections, just generalities that were occurring during the road construction phase at Mountain Terrace Estates.
>
> And I became deeply disturbed that this wasn't up to the level it needed to be.  And this was  - - this actually reached the point of going at board meetings, the level of dissatisfaction.
>
> You're going to have to bear with me.  This is a lengthy  - - lengthy discussion.  But Joey was receiving his orders from Maureen.
>
> Q.      What's your basis for saying that?

> A.   What Joey told me.
>
> Q.   Now, Joey was the road supervisor.
>
> A.   He was the acting roadmaster even though he was never officially appointed, which is another act of confusion.  We essentially had no roadmaster for one whole year.  But the guidance was coming from Maureen on how to run the Department of Public Works.

(*Id.*, pp. 88-90).

Altemose stated that his problem with Plaintiff was:

> Now, you suggested that she was good as a secretary; she was good at the bookkeeping; she was good as the treasurer.  Your problem was with her functioning in the Department of Public Works.  Is this what you've been talking about?
>
> A.   It's talking about being a team player.  The teams here, the office  - - the office and the Department of Public Works have to operate as one unit  - -
>
> Q.   Okay.
>
> A.   - - to be successful.

(*Id.*, pp. 93-94).

For the years 2000-2002, Plaintiff was evaluated as Above Average in the team player category of the evaluation.  In 2003, Plaintiff was rated as Outstanding in this category.  (Doc. 23, Ex. 3, Atts. 4-7).  Also in her 1999-2001 evaluation, it was noted that Plaintiff should not be placed in an awkward position of decision making, and that the supervisors should field all of these situations.  (*Id.*, Att. 4).

Altemose stated that he played no part in the formal evaluations given Plaintiff in 2002 and 2003, but Moore avers that she showed Altemose Plaintiff's evaluations, and that he concurred in Plaintiff's 2002 and 2003 evaluations. (*Id.*, p. 98 & doc. 28, ¶ 5.).

Altemose stated that in the 2003 primary election for Republican candidate of Supervisor, he supported Jim Sterrett over Moore, but that it was not because Moore had voted in January 2002 to give Plaintiff a job.  (*Id.*, p. 101).  He stated that he supported Sterrett because they had the same concerns over the Township's collapsing infrastructure and shared the belief that the Township had to aggressively start reconstructing the roads.  He stated that Moore was not of that opinion.  (*Id.*, p. 101-102).  Altemose stated that a few month prior to the general election in 2003, before Sterrett was elected, he had discussions with him concerning personnel issues in the Township and who the appointees would be.  (*Id.*, pp. 104-105).  They had 5 to 10 such meetings and other persons were also present.  (*Id.*).

Altemose stated that Plaintiff did not share the beliefs that he and Sterrett had that the Township should be doing the prep work for road maintenance itself, and stated that Plaintiff favored the use of outside contractors.  (*Id.*, p. 102).  This he said was "a fundamental theme in the Township moving forward."  (*Id.*).  Altemose stated that Plaintiff was instructing the staff of the Department of Public Works as to what job tasks to perform, even though she was not their boss.  (*Id.*, pp. 95-98).  Moore avers that Plaintiff "never worked as a Road Master or Assistant Road Master or de facto Road Master," and that she never heard Altemose refer to Plaintiff in such fashion.  (Doc. 28, ¶'s 21.-22.).

15

After the 2003 general election in which Sterrett was elected, and prior to January 2004, three to five meetings took place between Altemose, Sterrett and other persons, and they had discussions about the status of appointees and discussed the appointees on a list who would still be able to take the Township in the right direction and ones who would not.  (Doc. 23, Ex. 3, p. 114).   Altemose stated that prior to the November 2003 election, he and Sterrett may have had discussions about which appointees to get rid of.  (*Id*. 108).   In particular, they discussed the solicitors, and decided to get rid of John Prevoznik, the alternate solicitor.  (*Id*., p. 110).   The decision was made by Altemose and Sterrett in December 2003.  (*Id*., p. 111).  They had meetings, three to five, after the November 2003 general election before January 2004, and discussed other appointees and their status and which ones they thought would send the Township in the right direction.  (*Id*., p. 114).  They discussed Plaintiff during this time, and Altemose stated that:

> My discussion was I don't think this individual will work with our plan to move forward with the advancement of the Department of Public Works because she's not a team player.

> Q.     And which person were you talking about?

> A.     I was talking to Bruce.

> Q.     You were talking to Bruce.

> A.     I was talking to Bruce, and Jim was there also.

> Q.     And who were you talking about?

> A.     I was talking about Maureen.

> Q.     Maureen Sterner.

> A.     Yes.

16

> Q.      And what was Jim Sterrett saying in this meeting?  Did he agree with you or disagree with you?
>
> A.      He was leaning in that direction.
>
> Q.      Was a replacement discussed at this meeting?
>
> A.      Yes, we would need to have a replacement.
>
> Q.      And who was discussed as the replacement?
>
> A.      Donna.  Donna Verdes.
>
> Q.      Who's Donna Verdes?
>
> A.      Our current secretary, slash, treasurer.

(*Id*, pp. 115-116).

In late December 2003, Altemose, Sterrett and Bruce interviewed Verdes for the job of secretary/treasurer, and they made a decision at that time that Verdes would be the replacement for Plaintiff.  (*Id*., p. 116).  The other supervisor, Mr. Bourke, was not involved in this review process even though he would have a vote at the January 2004 Township reorganizational meeting as to the appointees.  (*Id*., p. 117).  Bourke was not involved in the process in which Altemose and Sterrett participated in interviewing the possible replacements (four candidates were interviewed, Plaintiff was not) for Plaintiff because:

> it would've probably questioned the legalities of two supervisors meeting making decisions.  That would have been  - - that could have been very ugly.  A citizen and a supervisor can meet, but two supervisors cannot meet behind closed doors and make decisions like that.  That violates the Sunshine Laws.

(*Id*., p. 117).

At the January 2004 reorganizational meeting, Plaintiff, solicitor Quigley and assistant solicitor Prevoznik, and Tom Delese as Road Master were not reappointed to their positions.  (*Id.*, pp. 123-124).   Plaintiff, Delese, and Prevoznik were all involved in the election contest suit challenging Altemose's 2002 election as supervisor in which Delese's write-in campaign failed.

In an executive session on the evening of the 2004 Township reorganizational meeting, in which the three Supervisors were present, Plaintiff was told that she was not being reappointed as secretary/treasurer.  When she asked why not, Altemose stated:

> Q.     Do you remember my client asking you why she was not being reappointed?
>
> A.     I remember that statement.  That I do remember.
>
> Q.     And what was the context of that statement?  What's your recollection of the context that statement was being made?
>
> A.     I remember that statement, and I remember an answer of I don't want to give you any reasons.  You are just  - - you're in a year-to-year position; you're under the appointments, and I really don't want to go any further.

(*Id.*, pp. 144-145).

When Altemose was asked if he remembered telling Plaintiff why she was not being reappointed, he stated:

> Q.     you said in response to that, "Oh, we can't tell you that, because if we did, you would sue us and we would lose."  That's her recollection.
>
>       Do you disagree that you said that?
>
> A.     There may have been a statement that had similarity to that.  But I can't tell you what exactly was said.

> Q.      Okay.  So if her testimony is "Oh, we can't tell you that,
> because if we did, you would sue us and we would lose," you're
> saying you're not contradicting that you said that?
>
> A.      I really can't answer that.  Because if I don't remember what
> I said, I don't know where to go from there.

Altemose also stated:

> I may have said that.  I may have.  But I can't say if I did;
> I can't say if I didn't.  I could've said something differently.  Jim
> could have said something.  I don't even remember who made the
> actual comment similar to that, exact to that.  I don't remember if it
> was me or Jim.  Really don't remember that.

(*Id*., pp. 146-147).

The vote to appoint Verdes as secretary/treasurer was two to one, with supervisors Bourke

voting against her, and Altemose and Sterrett voting for her.  (*Id*. 17-171).

Altemose stated as follows with respect to whether there was any discussion at the executive

session in January 2004 about reappointing Plaintiff:

> Q.      Was there any discussion at the executive session by Bourke
> about retaining Maureen?
>
> A.      Yes.
>
> Q.      What did he say?
>
> A.      Bill felt that her performance was high enough that she should
> remain as the secretary-treasurer.
>
> Q.      Did he say anything else?
>
> A.      That she had "X" amount of years of service in.  He felt her
> service was very good, if not better.  And he  - - he didn't feel the
> same way that I did.
>
> Q.      And what else did he say?

A.      I think that pretty much sums it up.

Q.      Was there any discussion about this was improper retaliation for exercising her First Amendment rights?

A.      No.

Q.      Did anyone ever suggest that to you?

A.      I've never heard that until just this.

Q.      Was there any discussion about her evaluations?

A.      No.

Q.      Were you aware of her evaluations?

A.      Yes.

Q.      Did you see her evaluations, before you made the de  - - before you had this discussion?

A.      I know I've read some of them.  I've seen some of them.

Q.      What was your overall impression of her evaluations.

A.      Not very comprehensive.

Q.      Not comprehensive?

A.      No.

Moore, in her Affidavit, averred as follows over why Plaintiff was not reappointed:

23.  I appeared at the reorganizational meeting as a concerned citizen in January of 2004.

24.  At the reorganizational meeting, as they listed the new employees for 2004, the name of Maureen Sterner was conspicuously absent as Secretary/Treasurer.

25.  I specifically asked Francis Altemose, II why Maureen Sterner was not reappointed as Secretary/Treasurer.

26.  I was told by Francis Altemose, II that the Board does not have to give a reason, it is at their discretion.

27.  I knew why she was not reappointed.

28.  Maureen Sterner was not reappointed because she exercised her First Amendment Right to support Tom Delese in the election in 2001 and in the court action filed by John Prevoznik.

29.  It is no accident that the three persons who suffered adverse employment decisions at the January, 2004 reorganizational meeting were John Prevoznik, Maureen Sterner, and Tom Delese who were involved in the 2002 effort to defeat Francis Altemose, II.

(Doc. 28, ¶' 23.-29.).

Plaintiff averred in her affidavit regarding the executive session meeting in January 2004, and

the reason why she was not reappointed, as follows:

When told by Altemose/Sterrett that I lost my job, I asked why. Altemose responded:

**"Oh, we can't tell you that because if we did, you would sue us and we would lose."**

(Doc. 29, p. 10, ¶ 36. B, emphasis in original).

In their Motion for Summary Judgment, the Defendants argue that the evidence is not

sufficient for the factfinder to conclude that they retaliated against the Plaintiff by not reappointing

her secretary/ treasurer due to her First Amendment political activity.  They argue that there is no

evidence to support Plaintiff's *Monell* claim against Defendant Township.  They state that there is

no evidence that Altemose and Sterrett acted wantonly or with evil motive in voting not to

21

reappoint Plaintiff to support Plaintiff's claim for punitive damages against the individual Defendants.  Individual Defendants also argue that they are immune from the Plaintiff's claims against them pursuant to the doctrine of qualified immunity, since they were performing a discretionary function under the Pennsylvania Township Code in not reappointing Plaintiff to secretary/treasurer.  (Doc. 19).  Finally, Defendants maintain that there is no evidence to support Plaintiff's claim under the Pennsylvania Sunshine Law.

Defendants assert that Plaintiff was not retaliated against due to her First Amendment activities, and state that there is insufficient evidence that their decision not to reappoint her in January 2004 was any way causally connected to her 2001 political activity in supporting Delese over Altemose in the Republican primary supervisor election and in signing a petition regarding the legal challenge to Altemose's election.  We find factual disputes as to whether Plaintiff was truly in a position to set Township priorities, such as not emphasizing Township roads and infrastructure enough to suit Altemose, and whether she was a decision maker, such as a *de facto* Road Master.

We shall first address the Defendants' contention that Plaintiff's First Amendment claims against them in Count One, averring that she was not reappointed to her Township position in retaliation for exercising her constitutional rights, have not been established  by the evidence.

## IV.  Discussion.

### A.  First Amendment Claim

The Defendants move for summary judgment by arguing that there is not sufficient evidence in the record to create a factual question for a jury as to whether their decision not reappoint Plaintiff to her job as Township secretary/treasurer was because of her First Amendment activities

detailed above.  We disagree.

The Court in *Brominski v. Co. of Luzerne*, 289 F.Supp.2d 591 (M.D. Pa. 2003), annunciated

the standard for a First Amendment freedom of speech retaliation claim (as Defendants recognize,

Doc. 19, pp. 6-7, and Plaintiff recognizes, Doc. 31, pp. 1-2) and stated:

> "Under 42 U .S.C. § 1983, public employees may sue to
> enforce [First Amendment] protection if (1) they spoke on a
> matter of public concern; (2) their interest in that field
> outweighs the government's concern with the effective and
> efficient fulfillment of its responsibilities to the public;
> (3) the speech caused the retaliation; and (4) the adverse
> employment decision would not have occurred but for
> the speech." *Fogarty v. Boles*, 121 F.3d 886, 888
> (3d Cir. 1997).  Plaintiff has the burden of showing that
> "the speech was a substantial or motivating factor for the
> discharge." *Feldman v. Philadelphia Housing Authority*,
> 43 F.3d 823 (3d Cir. 1994).

*Brominski*, 289 F. Supp. 2d at 595.  *See also Ballas v. City of Reading*, 168 F. Supp 2d 398, 401

(E. D. Pa. 2001).

There is also a First Amendment right to freedom of association.  As the Court stated in

*DeFiore v. Vignola*, 835 F. Supp. 249, 251 (E.D. Pa. 1993):

> It is well settled that a state may not condition hiring
> or discharge of employees in a way which infringes on their
> right to political association. *Bennis v. Gable*, 604 F.Supp. 244,
> 251 (E.D. Pa. 1984).  Indeed, the courts have recognized that
> the basic right of political association is assured by the First
> Amendment to the United States Constitution and is protected
> against state infringement by the Fourteenth Amendment.  *Id.,*
> at 252, citing *Elrod v. Burns*, 427 U.S. 347, 356, 96 S.Ct. 2673,
> 2681, 49 L.Ed.2d 547 (1976).  Freedom of association includes
> the right to engage in group advocacy of various political
> beliefs and the right to organize effectively, assemble, speak,
> write and proselytize as individuals see fit.  *Orloski v. Davis,*
>  564 F.Supp. 526, 533 (M.D. Pa. 1983).

The *Defiore* Court also stated:

> It is therefore equally well established that conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 2739, 111 L.Ed.2d 52 (1990); *Elrod v. Burns, supra*, 427 U.S. at 362-363, 96 S.Ct. at 2684.  This condition, however, is not without limits. To the contrary, where it can be shown that party affiliation is an acceptable requirement for some type of government employment or that an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency.  *Branti v. Finkel*, 445 U.S. 507, 516, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980), citing *Elrod v. Burns*, 427 U.S. at 366, 96 S.Ct. at 2686.  Thus, the courts have held that "a nonpolicymaking, nonconfidential government employee" cannot be discharged on the sole ground of his or her political beliefs but that an employee who "acts as an advisor or formulates plans for the implementation of broad goals" may be discharged upon a proper showing.  *Zold v. Township of Mantua*, 935 F.2d 633, 635 (3rd Cir. 1991) citing *Elrod*, 427 U.S. at 367-368, 375, 96 S.Ct. at 2686-2687, 2690; *Brown v. Trench*, 787 F.2d 167, 168 (3rd Cir. 1986).

*Id*. at 251-252.

Both parties agree (Doc. 19, p. 5 & Doc. 31, p. 1) that in order to establish a *prima facie* case of retaliation for exercise of freedom of association First Amendment right, Plaintiff must show:

> an employee who contends that an adverse employment action was taken against him based upon the exercise of his association rights must show that he was engaged in constitutionally protected conduct, which conduct was a substantial or motivating factor in the government employer's decision.  *Asko v. Bartle*, 762 S.Fupp. 1229, 1231 (E.D. Pa. 191).  Thereafter, the defendant has a substantial burden of demonstrating that political affiliation is an appropriate requirement for the effective performance of the public office in question and that it has an "overriding

24

interest" such as would validate encroachment on the
employee's First Amendment rights.  *Birns v. County of
Cambria, PA,* 971 F.2d 1015, 1022 (3ʳᵈ Cir. 19910;
*Zold v. Township of Mantua, supra.,* 935 F.2d at 635.

See also *Farrell v. Planter's Life Savers Co.,* 206 F. 3d 271, 279 (3d Cir. 2000)(citation

omitted).

We find that, as in *Curinga v. City of Clarion*, 357 F. 3d 305, 309 (3d Cir. 2004), our case

concerns two separate First Amendment rights, freedom of speech and freedom of association.

In fact, Plaintiff pleads in her Complaint that Defendants purposefully terminated her employment

with the Township "solely in retaliation against her for exercising her First Amendment rights to Free

Speech and Association." (Doc. 1, ¶ 23.).  The *Curinga* Court stated that both rights are implicated

when "a high-level government employee speaks out against his public employer during an election

campaign."  *Id.*   However, in *Curinga*, the Plaintiff, who was terminated after he campaigned

against a winning incumbent city council member in the primary election, in part, by writing a letter

and by filing an election fraud lawsuit, was a principal policy making employee, namely the

municipal manager.  As the *Curinga* Court stated:

> The First Amendment protects an employee who speaks
> out on a matter of public concern, so long as the employee's
> interests outweigh the government's interest in efficient
> operations.  At the same time, public officials may be
> able to terminate a policymaking employee on the basis of
> political affiliation and conduct regardless of freedom of
> association rights.

*Id.* at 309.  The Court stated that when a confidential or policy making employee is involved and

engages in speech or conduct against his public employer, the analytical approach to use is the

approach under the freedom of speech doctrine, *i.e.* the *Pickering* balancing test.  *Id*.

First, we must decide whether the position at issue in our case, *i.e.* Township secretary/treasurer, related to partisan political interests or concerns.  As the Court in *Defiore*, 835 F. Supp. at 252, explained:

> As outlined by the Fourth Circuit Court of Appeals in *Stott v. Haworth, supra,* at 141-142:
>
>> A threshold inquiry, which derives from *Branti,* involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to "partisan political interests . . . or concerns."  445 U.S. at 519, 100 S.Ct. at 1295.
>>
>> That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation?  Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?
>>
>> If this first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement.  We note that in conducting this inquiry, courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office . . . (citations omitted).  The relevant inquiry is to the function of the public office in question and not the actual past duties of the particular employee involved.

The *Curinga* Court, 357 F. 3d at 310, cited to the case of *Elrod v. Burns*, 427 U.S. 347 (1976), "where the [Supreme] Court restricted the dismissal of public employees for partisan reasons," and stated as follows regarding the analysis to be used for politically motivated discharges of public employees who held policymaking positions:

26

the Court in *Elrod* allowed dismissals based on political affiliation for "policymaking" positions.  Policymaking employees with different political affiliations or orientations could thwart the will of the electorate and block the implementation of new policies.  *Id.* at 367, 96 S.Ct. 2673.  Those who were not "policymakers" were "not in a position to thwart the goals of the in-party" and were protected.  *Id.* The Court refined the policymaker exception four years later in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1989), holding "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  *Id.* at 518, 100 S.Ct. 1287.

Some of the factors that are to be considered in determining  if the *Elrod* exception applies

are:

whether a difference in party affiliation was "highly likely to cause an official be ineffective in carrying out" his duties.  660 F.2d 517, 521 (3d Cir. 1981).  In *Brown v. Trench*, we held a key factor was whether the employee has "meaningful in put into decisionmaking concerning the nature and scope of a major township program."  787 F.2d 167, 168 (3d Cir. 1986). [FN3] *See also Zold v. Township of Mantua*, 935 F.2d 633 (3d Cir. 1991) (applying the *Branti* test to determine whether party affiliation is an appropriate requirement for the effective performance of the duties of the public office.

FN3. *Brown* listed specific factors in this determination, including "whether the employee participates in . . .  discussions or other meetings, whether the employee prepares budgets or has authority to hire or fire employees, the salary of the employee, and the employee's power to control others and to speak in the name of policymakers."  787 F.2d at 169.

*Id.,* 310-311.

The termination no longer has to be based on an employee's different political affiliation. It applies to members of the same party. The definition of political affiliation includes persons of the same party. Thus, "courts have upheld terminations under *Elrod-Branti* of policymaking employees who openly supported campaigns against their current or subsequently elected employer." *Id.* at 311. This is the situation in our case. However, we find a factual dispute exists as to the threshold question of whether Plaintiff was a policymaking or confidential employee and thus, we are unable to determine whether under the *Branti* test her party affiliation was an appropriate requirement for the effective performance of her duties as secretary/treasurer of the Township.[9]

The *Curinga* Court specifically stated that other circuits have broadly defined "'political affiliation' to include commonality of political purpose, partisan activity, and political support." *Id.* at 311(citations omitted). In our case, as discussed above, we construe Altemose's testimony to be that Plaintiff did not share the same commonality of political purpose as he and Sterrett did for the Township with respect to the high priority of road maintenance, and the need for rebuilding the Township's infrastructure and not by contracting out the road work. While, as stated above, the

---

[9]While the Court in *Curinga* applied the *Pickering* test, Plaintiff in that case undisputedly held, as city manager, "the most sensitive, high-level policy making appointive position in the City," "one that required confidentiality and a close working relationship with city council members to effectively implement their policies". 357 F. 3d at 313. We do not find that the evidence in our case is undisputed as to whether Plaintiff's position as secretary/treasurer of the Township was a high-level policy making appointive position in the Township that required confidentiality and a close working relationship with the supervisors to effectively implement their policies. While Altemose stated that Plaintiff made "high-end" decisions, the evidence as to this fact is disputed, as indicated above.

termination of policymaking employees who openly supported campaigns against the subsequently elected employer, have been upheld, in our case the facts are disputed as to whether Plaintiff was a policymaking employee.  While Altemose characterizes Plaintiff as the *de facto* Road Master and states that she made "high end" decisions, this was never Plaintiff's job title, and she never worked as Road Master or Assistant Road Master and was never referred to with this title  (Doc. 28, ¶ 21.-22. & Doc. 29, ¶'s 32-34).  Nor could Altemose point to one instance where Plaintiff made any high-end decisions.  (Doc. 23, Ex. 3, pp. 88-91).  Simply put, we cannot determine, based on the disputed facts, as a matter of law that political affiliation was a reasonable requirement for Plaintiff's position.  Thus, we are unable to determine if Plaintiff is exempted from the *Elrod/Branti* protections which are usually given to patronage dismissals.  *Id.* at 313.

The evidence indicates that, while Plaintiff's job did not involve policymaking decisions, there are certainly factual disputes as to whether Plaintiff was involved in Township decisionmaking on priorities, expenditures and implementation of priorities.  Thus, there are material issues of fact in this case as to whether Plaintiff's job involved Township decisionmaking of goals, priorities and their implementation where there could be political disagreement as to the proper goals and priorities, and how they were handled.  Specifically, Altemose stated that he disagreed with Plaintiff's lack of prioritizing the Township roads and infrastructure, and how she felt that the road work and road maintenance should be contracted out as opposed to having Township personnel doing as much of the prep work as possible.   As the Court in *DeFiore*, 835 F. Supp. at 253, concluded, we cannot find as a matter of law that political affiliation, under the broader definition of this term, is or is not a necessary requirement for the effective performance of the Township

29

secretary/treasurer position to which Plaintiff was not reappointed. These factual disputes prevent us from utilizing the *Branti* test in our case to determine whether political affiliation (*i.e.* commonality of political purpose) was an appropriate requirement for the effective performance of the duties of Township secretary/treasurer. It is not clear in this case if Plaintiff's position as secretary/treasurer rendered her a confidential or policymaking Township employee such that her political affiliation with the priorities of Defendants Altemose and Sterrett was required, *i.e.* her loyalty and ability to implement the policies of Defendants Altemose and Sterrett.

We also disagree with Defendants (Doc. 19, p. 7), agree with Plaintiff (Doc. 31, pp. 2-3), and find that Plaintiff's speech and conduct in supporting the candidacy of Delese for supervisor did involve a matter of public concern. We based our finding on *Curinga*, in which the Court found that Curinga's campaigning for candidates and urging voters to vote against his opponents were speech and conduct involving matters of public concern. 357 F. 3d at 312-313.

In examining the record in the light most favorable to the Plaintiff, as we must, we also find that there are material factual disputes as to whether the Plaintiff's protected First Amendment activity of speaking in favor of and supporting Delese's candidacy for supervisor during the 2001 primary Township election, and in signing the election fraud challenge petition was a substantial or motivating factor behind the Defendants' 2004 decision not to reappoint Plaintiff to her position she held since about 1998. The Plaintiff has submitted adequate evidence, as detailed above, from which a reasonable factfinder could conclude that her decision to support the campaign of her friend Delese for Republican supervisor and later participating in the election fraud lawsuit, was a substantial or motivating factor in the decision of January 2004 (made in December

2003 when Sterrett was not yet sworn in as a supervisor) by Defendants not to reappoint her to her secretary/treasurer Township job she held since about 1998.  (*See* Doc. 29).[10]

As the *Brominski* Court stated, "[w]e find that the Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to the reason for his termination.  If a reasonable factfinder determines that Plaintiff's testimony is credible, then there is sufficient evidence to conclude that retaliation was a substantial factor in Plaintiff's termination." *Brominski,* 289 F. Supp. 2d at 596.

Therefore, we shall deny the Defendants' Summary Judgment Motion with respect to the Plaintiff's First Amendment claims under 42 U.S.C. § 1983, and the Plaintiff will be permitted to proceed with these claims against the individual Defendants.

### B. Monell claim against Defendant Township

Defendants argue that the Defendant Township is entitled to the entry of summary judgment since Plaintiff has not established a viable *Monell* claim against it.  They state that Plaintiff has not offered any evidence that the Township had any policy or custom that caused her alleged First Amendment violations.  (Doc. 19, p. 17).

---

[10]While Defendants argue that there was too long of a time lapse between Plaintiff's support for Delese in the 2001 primary election and her support of the election fraud suit in the Fall of 2001, to support the retaliation claim in this case, Plaintiff has produced enough evidence to show that Altemose had to bide his time to retaliate against Plaintiff until the election in the Fall of 2003 for a political ally, namely Sterrett, to be elected in place of Moore, who had supported Plaintiff.  Further, the evidence shows that Altemose began to meet with Sterrett, who had not yet been sworn in as supervisor, in November/December 2003 without the other Supervisor being present, to discuss the replacement of appointees, including Plaintiff, who they did not believe adhered to their priorities for the Township and how to implement them.

When a claim against a municipality or governmental entity such as the Defendant Township is based on Section 1983, the entity can only be liable when the alleged constitutional violation implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978).  A governmental custom for purposes of Section 1983 is defined as "such practices of state officials...[as are] so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691.  Custom can be shown by evidence of knowledge and acquiescence by high-level policy-makers. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989). The court must then inquire "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  The policy must be the "moving force" behind the constitutional violation. *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion)).  In this case, with respect to the Plaintiff's Section 1983 claim against the Township, the Plaintiff alleges in her  complaint that "[t]he decision to terminate Plaintiff in retaliation for her First Amendment rights ... was officially adopted and promulgated by Defendant Township's officers acting as Defendant Township's Board of Supervisor ... ." (Doc. 1, ¶ 32. (Count Two)).  Plaintiff also alleges that the individual Defendant supervisors had final authority to establish municipal policy with regard to her termination. (*Id.*, ¶ 33.).

"A plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between the execution of the policy and injuries suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). The law is clear that liability will not be imposed

under § 1983 on a *respondeat superior* or vicarious liability theory.   *See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991).

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict.  A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

The Court in *Stoneking v. Bradford Area School District*, 882 F.2d 720, 725 (3d Cir. 1989), held that liability for state officials can arise "from their policies maintained in deliberate indifference to action taken by their subordinates."  According to *Stoneking*, "a plaintiff must do more than show the defendant could have averted her injury and failed to do so.  In order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the [harm] and that the defendant acted with deliberate indifference to that [harm].  In order to establish deliberate indifference on the part of the defendant, 'something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm' to plaintiffs."  *Id.; Black by Black v. Indiana Area School District*, 985 F.2d 707, 712-13 (3d Cir. 1993) (quoting *Colburn*, 946 F.2d at 1025).

Defendants contend that the Township is entitled to judgment as a matter of law on the Plaintiff's § 1983 claim under a policy, practice, or custom theory of liability, since Plaintiff does not submit any evidence that the Township had an official policy or custom adopted by a final decision

maker to  not reappoint Township personnel who campaigned against an elected supervisor.

Plaintiff argues that Defendant Township is organized under Pennsylvania's Second Class Township Code, 53 P.S. § 65101, *et seq.*, and that under this Code, the Supervisors have the duty to govern the Township and to execute legislative, executive and administrative powers.  (Doc. 31, p. 9). Plaintiff also states that under the Code, the Supervisors have the power to hire and fire the secretary and treasurer.  Plaintiff concludes that if she has established a *prima facie* case of retaliation against the individual Defendants, Altemose and Sterrett, who were on the Board of Supervisors when they terminated her, then she has also satisfied her burden with respect to her *Monell* claim against the Township that she was fired pursuant to an official Township policy.  (*Id.*).

We disagree with Plaintiff and find that the Township can only be held liable under § 1983 where it is shown that it caused the violation of Plaintiff's First Amendment rights.

A municipality cannot be responsible for damages under Section 1983, *(i.e.* solely because of actions by its officials),  *Monell v. Dept. of Soc. Servs., New York City*, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 4889 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  We must review claims of municipal liability "independently of the Section 1983 claims against the individual Defendants." *Kniepp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994).

A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the officials come into contact.  *City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197.  This typically requires proof of a pattern of underlying constitutional violations.

*Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).  Although it is possible, proving deliberate indifference in the absence of such a pattern is a difficult task.  *See id.*  There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir. 2001) (quoting *City of Canton*, 489 U.S. at 385, 109 S.Ct. 1197).

A municipality such as Defendant Township can only be liable for a constitutional deprivation that is directly caused by a municipal policy, custom or practice.  To prevail, the Plaintiff must identify a municipal policy or custom that reflects a conscious choice of policymaking officials that amounts to deliberate indifference to the rights of the people with whom they come into contact.  *Carswell*, at 224; *McCracken v. Freed*, 2006 WL 833452 * 3 (E.D. Pa.).

We find that Plaintiff is attempting to hold the Township liable on the basis of vicarious liability.  However, this is not an acceptable basis to hold the Township liable on Plaintiff's *Monell* claim.  We find that Plaintiff does not point to any evidence that the Township had a policy or custom that amounted to deliberate indifference to the First Amendment rights of its citizens.  (*Id.*, pp. 9-10).  Nor has Plaintiff showed that the Township was aware of such incidents in the past. Additionally, the Plaintiff has not shown that the Township had a policy that  played an affirmative role in bringing about the harm she claims to have suffered and that the Township acted with deliberate indifference to that harm.   Therefore, we find that the Defendant Township of Tunkhannock is entitled to summary judgment with respect to the Plaintiff's *Monell* claim (Count Two).

### C. Claim for Punitive Damages

As mentioned, Plaintiff seeks punitive damages against the individual Defendants alleging that their "actions were outrageous, egregious, intentional, willful, wanton, reckless and in deliberate disregard to Plaintiff's rights ... ." (Doc. 1, ¶ 30.).  As Defendants correctly state (Doc. 19, p. 17), as we have noted above, Plaintiff cannot recover punitive damages against the Defendant Township in this case on her § 1983 claim.  We also have noted that Plaintiff does not seek such damages against the Defendant Township.[11]

As this Court stated in *Patel v. Himalayan Intern. Inst. of Yoga Science and Phil.*, 1999 WL 33747891 (M.D. Pa.), punitive damages are intended to punish and deter.  Both parties cite to *Coleman v. Kaye*, 87 F. 3d 1491, 1497 (3d Cir. 1996), which held:

> punitive damages may be awarded under 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

---

[11]The Plaintiff is statutorily precluded from recovering punitive damages against local governmental agencies like the Township, but not against the individual Defendants.  The Supreme Court has determined that, absent a statute to the contrary,  punitive damages cannot be awarded against a government entity. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748 (1981).  However, this preclusion of a punitive damages remedy does not apply to the  individual defendants. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625 (1983). In *Smith*, the Court held that punitive damages may be recovered from individual defendants in certain §1983 cases.

    In any event, as discussed above, we shall grant Defendants' Summary Judgment Motion with respect to Plaintiff's § 1983 municipal liability claim against the Defendant Township.

Further, as Defendants point out, in *Brennan v. Twp. of Teaneck*, 350 F. 3d 399, 429-430 (3d Cir. 2003), retaliatory motive may be insufficient alone in § 1983 retaliation action to satisfy the award of punitive damages.  The *Brennan* Court stated that "it is clear under the Court's holding in *Smith v. Wade* that punitive damages require more than the retaliatory motive itself."  *Id.*

Defendants state that there is no evidence that their alleged conduct was driven by evil motive or intent, and that there is no evidence that they acted in reckless disregard of Plaintiff's First Amendment rights.

We agree with Plaintiff (Doc. 31, pp. 10-11) that there is sufficient evidence for a jury to conclude that Defendants' conduct in this case, if proven, was wanton and involved reckless indifference to Plaintiff's First Amendment rights.  *See Monteiro v. City of Elizabeth*, 436 F. 3d 397 (3d Cir. 2006)(court held evidence was sufficient for jury's punitive damages award in § 1983 action where it found that Defendant city council president had council member removed from council meeting based on his viewpoint in violation of his First Amendment free speech right).  We find, as discussed above, that Plaintiff has produced sufficient evidence that Defendant Altemose planned to not reappoint any Township appointee who was against him and who supported the election fraud lawsuit.  There is also sufficient evidence that Defendant Altemose then bided his time until Defendant Sterrett was elected in 2003, and that he was able to convince Sterrett in a series of meetings, prior to Sterrett's swearing in and without the other Supervisor, not to reappoint Plaintiff.  We have also found that the evidence is disputed as to whether Plaintiff's protected speech was a motivating factor in the Defendants' decision not to reappoint her.  We find that the evidence of Defendants' conduct, if proven by Plaintiff at trial, is sufficient to show that Defendants

engaged in malicious conduct or acted in wanton and willful disregard of Plaintiff's rights.

### D.  Qualified Immunity of Defendants

Defendants argue that they are entitled to qualified immunity for performing a discretionary function of not reappointing Plaintiff to Township secretary/treasurer in accordance with the Pennsylvania Township Code.   Thus, Defendants argue that the named individual township supervisor Defendants are entitled to qualified immunity while acting within the scope of their discretionary duties under the Pennsylvania Township Code.  (Doc. 19, pp. 19-22).  Plaintiff argues that there is sufficient evidence that a violation of her First Amendment rights occurred, and that the law was clearly established at the time of the alleged violation.

Initially, the Plaintiff and Defendants agree that public officials are entitled to qualified immunity and are, thus, shielded from civil damages from their conduct within the scope of their official duties, unless their conduct clearly violated constitutional or statutory rights and they would have reasonably been aware of that violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982).  (Docs. 19, p. 19-20 & Doc. 31, p. 11).  Since we have determined that the Plaintiff has withstood the review of her §1983 claims under the First Amendment against the individual Defendants, the only issue is whether the individual Defendants would have reasonably been aware of the alleged First Amendment violations.  It is clear that Plaintiff alleges that these individual Defendants were aware that they were improperly not voting to reappoint her to her position due to retaliation for her election activities to support Delese in the 2001 primary against Altemose. In fact, Plaintiff has alleged that the individual Defendants acted in concert to retaliate against political opponents.  The issue of the "reasonableness" of the individual's understanding of this

violation requires more inquiry than can be provided in a review of the Complaint and, as such, is an issue which we can be decided under the framework of F.R.C.P. 56.

The Defendants contend that they are entitled to qualified immunity on the Plaintiff's First Amendment claims since, under the Pennsylvania Township Code, they had authority not to reappoint Plaintiff as secretary/treasurer of the Township. They argue that there is no casual link between their January 2004 decision and Plaintiff's exercise of her First Amendment rights with respect to the 2001 primary election in which Altemose defeated Delese. We find that if Plaintiff can show that Defendants' motivation in not reappointing her Township secretary/treasurer was their retaliation against her for supporting the candidacy of Delese over Altemose and for her signing the election fraud lawsuit petition against Altemose's election as supervisor, that Defendants as reasonable public officials would have known that their conduct at the January 2004 reorganizational meeting violated Plaintiff's clearly established First Amendment rights, and they would not be subject to qualified immunity in this case. We also find that the question as to the Defendants' motivation in not reappointing Plaintiff despite her undisputed above average evaluations and her successful performance of the job for several years (Doc. 23, Ex. 3, p. 84),[12] is a fact question that must be resolved by the jury.[13]

---

[12]Defendant Sterrett stated to Delese that the Township made a mistake in terminating Plaintiff since she did a good job. (Doc. 32, Ex. 1, p. 23). Defendants also wrote Plaintiff a letter of recommendation after she was not reappointed and stated in part that she was given their highest job performance rating. (Doc. 23, Ex. 2, Att. 3).

[13]As in *Monteiro*, we shall use at trial specially crafted jury verdict interrogatories in order to resolve the stated question of fact. We have a copy of the *Monteiro* jury verdict interrogatories, and we will being using a similar form of interrogatories. The parties in our case

Since we find that in our case, as in *Monteiro*, that the availability of qualified immunity of our Defendants depends on the stated disputed issues of fact, we find that it is not appropriate  to resolve this issue by way of Defendants' Summary Judgment Motion.   As we have previously discussed, we have found that material factual disputes exist as to whether the decision of the Defendants to not reappoint Plaintiff was objectively reasonable.   Since we find that disputes of material fact exist as to if the Defendants are entitled to immunity for their conduct, we shall deny Defendants' Summary Judgment Motion insofar as it requests that the individual Defendants be afforded qualified immunity.

In *Bennett v. Murphy*, 174 F.3d 133, 136-137 (3d Cir. 2001), the Court stated:

> Once if is determined that evidence of a constitutional violation has been adduced, courts evaluating a qualified immunity claim move to the second step of the analysis to determine whether the constitutional right was clearly established.  That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?  The focus in this step is solely upon the law.  If it would not have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity.  If the requirements of the law would have been clear, the officer must stand trial.

---

will also be able to submit proposed jury verdict interrogatories as part of their pre-trial submissions.   The Court will then make the ultimate decision as to qualified immunity of the Defendants.  *See Carswell v. Bor. of Homestead*, 381 F. 3d 235, 242 (3d Cir. 2004) (citing *Doe v. Groody*, 361 F. 3d 232, 238 (3d Cir. 2004)("The jury, however, determines disputed historical fact material to the qualified immunity question."); *Harvey v. Plains Twp.*, 421 F. 3d 185 (3d Cir. 2005) and *Curley v. Klem*, 298 F. 3d 271, 279 (3d Cir. 2002)("A judge may use special jury interrogatories ... to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity.").

We have found a factual dispute exists as to whether it was clear to the Defendants what the law required with respect to the Plaintiff's First Amendment claim. As discussed, under the facts presented by the Plaintiff, including the Plaintiff's support of Delese's candidacy against Altemose and her support of the election fraud suit against the Altemose election, as well as Altemose's disdain towards the people who signed the affidavits alleging the illegality of his election and his belief that they should be criminally prosecuted for perjury due to false statements made therein (Doc. 23, Ex. 3, p. 53), a factual dispute exists as to whether reasonable officials would have understood that their actions were prohibited. Plaintiff has presented sufficient facts that she was not a policymaker (Doc. 23, Ex. 3, Atts. 2-7), that she had performed her job above average with no disciplinary problems, and that she fully cooperated with the Board of Supervisors in the past when it wanted to take the Township in a new direction (doc. 28, ¶'s 37.-39.). Thus, we shall deny Defendants' Summary Judgment Motion insofar as it requests that Defendants be afforded qualified immunity.[14]

### E. State Law Claim under Pennsylvania Sunshine Act

Defendants argue that Plaintiff did not establish a claim against the Defendant Township that it violated the Pennsylvania Sunshine Act. (Doc. 19, p. 23). As stated, in Count Three, Plaintiff avers that Defendant Township violated the Sunshine Act since the decision to terminate her was

---

[14]The Third Circuit has held that, in applying *Harlow*'s objective test for qualified immunity, evidence of a Defendant's state of mind may be considered when motivation is an essential element of the § 1983 claim. *Grant v. City of Pittsburgh*, 98 F.3d 116, 123 (3d Cir. 1996). Motivation is an element to the Plaintiff's First Amendment claims, as the District Court in *Monteiro* indicated. In this case, we have found a factual dispute as to the individual Defendants' motives for not reappointing Plaintiff to her Township position that she held for years without any problems.

not made at a public meeting; rather it was made by the individual Defendants before the Executive Session in January 2004.  (Doc. 1, ¶ 39.)  However, since we shall grant Defendants' Summary Judgment Motion with respect to Plaintiff's § 1983 federal claim against Defendant Township, we shall decline to exercise pendent jurisdiction over Plaintiff's state law claim solely against this Defendant.[15]

Accordingly, Defendants' Summary Judgment Motion shall be granted  in part and denied in part.  An appropriate Order will follow.


**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: April 18, 2006**

---

[15]It is appropriate for this Court to decline  to exercise supplemental jurisdiction over the pendent state law claim against Defendant Township  pursuant to 28 U.S.C. §1367(a) since  the federal claim against this Defendant shall not  remain.  Thus,  since Plaintiff's claim against Defendant Township, over which we have original jurisdiction, is not going to proceed, we decline to exercise supplemental jurisdiction over Plaintiff's Sunshine Act state law claim against this Defendant.  Thus, this state law claim will be dismissed without prejudice.  *See* 28 U.S.C. § 1367(c)(3).